UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-20293-CR- Altonaga

UNITED STATES OF AMERICA

v.

GUILLERMO SEPULVEDA,

   Defendant.
_____/

## FACTUAL PROFFER

The United States, Defendant Guillermo Sepulveda, a/k/a "Tony," (hereinafter, "the defendant" and/or "Sepulveda") and the defendant's attorney agree that if this case were to proceed to trial, the United States would prove the following facts beyond a reasonable doubt:

1. Between 2006 and 2015, Kirk Chambers was employed a sworn Florida State law enforcement officer, that is, as a Trooper with the Florida Highway Patrol (FHP).

2. The FHP is a law enforcement organization whose duties include enforcing traffic laws and regulations on Florida roadways. As part of their duties, FHP troopers are empowered to write traffic accident reports, access confidential accident information, and disseminate that information to authorized parties. FHP troopers are also sworn to enforce Florida laws and are not authorized to accept money or other compensation in exchange for the performance, or non-performance, of their duties.

3. In 2013, the FBI initiated an investigation into allegations that tow truck drivers and collision centers in South Florida were paying bribes to law enforcement personnel in South Florida. According to confidential sources, the law enforcement personnel were paid in return for allowing local wrecker operators (a/k/a "tow truck drivers") to illegally solicit business from

1

stranded drivers at accident scenes. The confidential sources also alleged that in some case the law enforcement personnel were also being paid to provide accident location information and run off, or otherwise discourage, other "pirate" wreckers from operating in areas where paying pirates were operating.

4. At that time, the confidential sources identified Kirk Chambers as a FHP trooper that was known to take bribes. The confidential sources also identified Guillermo Sepulveda, a/k/a "Tony," as a wrecker operator who was paying bribes to law enforcement.[1]

5. In 2014, during the course of the investigation, the FBI developed CHS-1 as a confidential source. CHS-1 alleged that Sepulveda and Chambers had a corrupt relationship. CHS-1 alleged Sepulveda would pay Chambers bribes in return for Chambers permitting Sepulveda access to accident scenes for the purpose of illicitly soliciting stranded accident victims for business.

6. On September 24, 2014, under FBI direction, CHS-1 met with Sepulveda. During that recorded meeting, CHS-1 told Sepulveda that CHS-1 had started business with a Russian chiropractor. CHS-1 told Sepulveda that if Sepulveda's boy (Chambers) could provide fresh accident reports, the chiropractor could pitch the accident victims for business. CHS-1 proposed paying Chambers $1000 for every 20 names. CHS-1 explained that CHS-1 and Sepulveda could split the money that was paid by the chiropractor for successful solicitations, which the CHS-1 expected to be $1200 each. Sepulveda agreed to help. Sepulveda believed that Chambers would be interested. Sepulveda called Chambers and set up a meeting between CHS-1, Sepulveda, and Chambers. Later that day, CHS-1 and Sepulveda drove to Chamber's private security business in Miami Gardens, Florida. During that meeting, which was recorded, CHS-1

---

[1] While the defendant admits participating in the conspiracy alleged in Count 1 of the Indictment, the defendant denies paying bribes to Chambers on previous occasions.

explained the job again. CHS-1 told Chambers that he would be paid for every 40 victims (name, address, & phone number. Chambers agreed to participate in the scheme.[2]

7.     On October 10, 2014, CHS-1 met Chambers at the Miami Gardens office. During the recorded meeting, Chambers provided FHP accident reports (Florida Traffic Crash Driver Information Exchange Reports) that listed 18 accident victim names and other identifiers, including their insurance companies. Many of the insurance companies for those accident victims (e.g. – GEICO, All State, USAA) are headquartered out-of-state and do business in more than one state. In exchange for the reports, CHS-1 paid Chambers $1000 cash. The meeting was recorded.

8.     On October 18, 2014, CHS-1 met Chambers at the security business in Miami Gardens. Chambers provided more reports, with 18 names, in exchange for $1000. The meeting was recorded. During the recorded meeting, Chambers emphasized that CHS-1 should shred the reports when he was done with them. The majority of the reports pertained to accidents that Chambers had handled himself.

9.     On October 31, 2014, CHS-1 and Sepulveda met Chambers in Broward County. During that recorded meeting, Chambers provided accident reports with 23 names, in exchange for $1,000 cash. During the meeting, which was recorded, Chambers said he was going paranoid about everyone being arrested. After the meeting, as they drove away, Sepulveda and CHS-1 counted the names together and Sepulveda told CHS-1 that "My part is done."

10.    On November 3, 2014, CHS-1 met with Sepulveda in Miami. In accordance with the agreement, CHS-1 paid Sepulveda $1,200 based on money that CHS-1 said was received

---

[2] Over time, the price was finalized at $50 a name, or in other words, $1000 per 20 accident victims.

from the chiropractor. Sepulveda also discusses recruiting other officers, including one of which Sepulveda said that he had paid bribes to before.

11. On November 12, 2014, CHS-1 met with Sepulveda, who was arranging another exchange with Chambers. Based on Sepulveda's prior recorded representations, CHS-1 expected 20 names. When the CHS-1 met with Sepulveda, however, Sepulveda told CHS-1 that Chambers had 40 names. This meeting was recorded.

12. Sepulveda called Chambers and arranged a meeting in Broward County. CHS-1 and Sepulveda travelled together to the meet location and got into Chambers personal vehicle. Inside that car, Chambers gave the reports to CHS-1, which had the top and bottom cut off (to hide the author of the report). Sepulveda told Chambers that he shouldn't cut the reports up, but that was Sepulveda's job. Chambers took $1000 in exchange for the reports.

13. When Sepulveda and CHS-1 drove away, Sepulveda told CHS-1 that he should have paid Chamber $2000 because of the number of names. During the next several days, Sepulveda advised CHS-1 that CHS-1 still had to pay Chambers, or Chambers would stop providing the reports. CHS-1 also exchanged text messages with Chambers, in which they discussed further payment because Chambers needed something for his anniversary. The meeting was recorded.

14. On November 17, 2014, CHS-1 met Chambers outside the Walgreens in Broward County and paid the remaining $1000 that was owed Chambers. The meeting was recorded.

15. On January 22, 2015, Guillermo Sepulveda was interviewed by the FBI. During the interview, Sepulveda admitted participating in a scheme for Chambers to provide CHS-1 accident reports, which would then be used by a Russian chiropractor to solicit patients. Sepulveda admitted that he made the introduction between CHS-1 and Chambers. Sepulveda

admitted that he knew Chambers would be paid for getting the accident reports. Sepulveda admitted that he expected to be paid $1,200 per month for assisting with the recruitment of Chambers. Sepulveda admitted receiving the $1,200 from CHS-1, but claimed that the money was for old tow bills owed Sepulveda. Sepulveda denied being present when CHS-1 paid Chambers.

16. Florida State law requires that agencies and officials creating, accessing, and storing accident information that lists the accident victim's name, phone numbers, and addresses protect that information as confidential for a period of 60 days. The accident reports referenced accidents that were less than 60 days old. Releasing that information to an unauthorized party before the 60-day period has elapsed, provides health care providers a competitive advantage because they can contact the injured parties directly, which is also illegal, and solicit business. Because insurance companies are ultimately billed, these activities also affect commerce. CHS-1, Sepulveda, and "the chiropractor" were not authorized parties and would not have had access to this information had Chambers not used his public position to access and distribute the accident reports in question.

17. During trial, the evidence that would have proven these facts would have included, but not necessarily been limited to: (a) Chambers and Sepulveda's recorded statements; (b) Text messages recovered from CHS-1's telephone; (c) Copies of the accident exchange forms provided by Chambers; (d) Surveillance photographs; (e) Images documenting Chambers accessing and downloading the accident reports from the FHP server; (f) testimony regarding Sepulveda's confession; and (e) Sepulveda's admissions during his pretrial detention hearing.

The facts described above are provided for the limited purpose of demonstrating the

factual predicate underlying the guilty plea. Accordingly, these listed facts are not every detail known to Sepulveda, or investigators, regarding the charged conspiracy.

_____  Date: 26MAY15
Anthony W. Lacosta
Assistant United States Attorney

_____  Date: May 26, 2015
Lee Marks
Attorney for Guillermo Sepulveda

_____  Date: May, 26, 2015
Guillermo Sepulveda
Defendant